EDGAR LUMBER COMPANY *v.* CORNIE STAVE COMPANY.

Opinion delivered June 20, 1910.

1. CONTRACT—PRIVATE CARRIER—PREFERENCE.—An agreement by a private carrier operating a steam tramroad to haul staves for a lumber company at a certain price and to charge all others a larger sum, and to credit the lumber company with all the surplus over the rates established in its favor, is not against public policy. (Page 453.)

2. CARRIERS—WHO ARE.—The fact that a motor car was run over a spur track for mail and passengers, without proof that charge was made therefor, does not establish the fact that the operator of the motor car was a public carrier of freight. (Page 453.)

3. CONTRACTS IN RESTRAINT OF TRADE—VALIDITY.—A contract in restraint of trade is valid when founded upon a valuable consideration if the restraint is reasonable as between the parties and not injurious to the public by reason of its effect upon trade, and whether the restraint is reasonable depends upon whether it is such as affords fair protection only to the party in whose favor it is given, and not so large as to injure the public. (Page 454.)

4. CONTRACTS—CONSTRUCTION—CONDUCT OF PARTIES.—Where the parties to an ambiguous contract have by their conduct placed a construction on it, that construction will be followed by the courts. (Page 455.)

5. ESTOPPEL—CONDUCT.—Where the purchaser of a lumber company's property, finding its contract with another in force, continued to perform it for three years and to receive the benefit under it, it will be held to be estopped to deny that it is liable under such contract. (Page 455.)

Appeal from Union Circuit Court; *George W. Hays,* Judge; affirmed.

STATEMENT BY THE COURT.

This suit was instituted in the Union Circuit Court by the Cornie Stave Company against the Edgar Lumber Company to recover damages in the sum of $972.11 for an alleged breach of contract. Both parties are corporations duly organized under the laws of the State of Arkansas. The contract of June 25, 1902, having expired by its own terms, this suit was brought on the second contract, which is as follows:

"This contract and agreement made and entered into by and between the H. C. McDaniel Lumber Company, of Wesson, Arkansas, hereinafter known as the party of the first part, and the Cornie Stave Company, of Junction City, Arkansas, hereinafter known as the party of the second part:

"Witnesseth that, for and in consideration of the sum of one dollar cash in hand paid by the party of the second part, the receipt of which is hereby acknowledged, the party of the first part hereby agrees and contracts with the party of the second part to use their best efforts at all times to secure cars for loading bolts and staves on their main line and spurs, and to deliver same promptly, when loaded, to their nearest connection with the Arkansas Southern Railroad.

"The party of the first part further agrees and contracts with the party of the second part that, in order to better protect the interest of the party of the second part in the territory adjacent to the tramroad of the H. C. McDaniel Lumber Company, to charge all parties, except the party of the second part to this contract, the following rates on shipments off their road: Staves and heading bolts, $20 per car; sawn staves and sawn heading, $20 per car; rough split staves, $25 per car; bucked staves, $30 per car. And all surplus over rates established for party of second part shall be credited to account of party of second part. In consideration of the above, the party of the second part agrees to pay to the party of the first part the following rates on stave mill products, viz: Oak staves and heading bolts, $10 per car; oak sawn staves and heading, $10 per car; oak rough split staves, $12 per car; oak bucked staves, $15 per car.

"The party of the second part further agrees, in consideration of the above specifications on the part of the party, to handle all stave products gotten out by them in the following territory, viz: north half township 19, range 17; all of township 19, range 18; all of township 20, range 18, in Union County, Arkansas. Also township 23, range 5 south and west of Cornie Creek; also township 22, range 5; also township 23, range 6 and township 22, range 6, in Claiborn Parish, Louisiana; over their logging road under their above agreement, and that they will not divert any part of said material to any other line for transportation.

"It is further agreed and understood that, should more than one class of material be loaded into the same car, the higher rate is to be effective on said shipment. It is further agreed that the freight due the party of the first part on above-mentioned shipments shall be paid by the party of the second part

on the 15th and 1st of each month.  It is further agreed and
understood by both parties that this contract is to be in full
force and effect immediately upon the expiration of the present
contract existing between the party of the first part and the
party of the second part, made and signed June 25, 1902, and
is to remain in full force and effect for the period of six years
from its commencement.  It is further agreed and understood
that this contract shall be binding on both parties to this agree-
ment, their heirs and assigns.

"This contract made and signed in duplicate this the 28th
day of April, 1903."

At the time these contracts were executed, and thereafter,
the Cornie Stave Company owned and operated a stave mill
at Junction City, Arkansas, on the main line of the Arkansas
Southern Railroad, which commenced at El Dorado and ex-
tended south sixteen miles to Junction City, and from there into
the State of Louisiana.  Cornie Junction was a regular station
on said railroad, about four miles north of Junction City.  The
town of Wesson was about four miles west of the town of
Cornie Junction and from the line of the Arkansas Southern
Railroad.  It came into existence by reason of the location there
of a sawmill plant by the H. C. McDaniel Lumber Company,
a domestic corporation.  A spur railroad track was constructed
from Cornie Junction to Wesson for the use of the McDaniel
Lumber Company in hauling its products from its mill to the
main line of said railroad at Cornie Junction.  For the purpose
of hauling saw logs to its mill, the McDaniel Lumber Company
constructed a tram or log road, some ten miles in length, ex-
tending out into its timber west of the mill.  This tram road
was of standard guage, and was connected with the spur track
at Wesson.  The McDaniel Lumber Company owned an en-
gine, and operated it for the purpose of hauling logs on its tram
road to its mill to be sawed into lumber, and also for the pur-
pose of hauling lumber from its mill over the spur track to
Cornie Junction on the main line of the Arkansas Southern
Railroad Company.  The cars used were obtained from the rail-
road company.

In the territory traversed by the tram road was valuable
stave timber, some of which was owned by the Cornie Stave

Company.  The contract in question was executed for the pur-
pose of having this stave timber hauled to its mill.

In the year 1904 the Edgar Lumber Company was incor-
porated, and during the same year purchased the entire holding
of the McDaniel Lumber Company.  The contract in question
was then in force, and was being performed by the McDaniel
Lumber Company.  The Edgar Lumber Company continued
the performance of the contract according to its terms for  a
period of time which will be stated later.  On the 14th day of
September, 1905, articles of incorporation of the El Dorado &
Wesson Railway Company were issued.  The stockholders were
in the main the same as those of the Edgar Lumber Company.
This railroad was constructed from Wesson to El Dorado, a
distance of ten miles.  The steel was removed from the spur
track between Wesson and Cornie Junction after the El Dorado
& Wesson Railroad was finished; and some time in August,
1907, the Edgar Lumber Company ceased to use said spur track.
Thereafter its cars were carried to the main line at El Dorado
over the El Dorado & Wesson Railroad.  The Edgar Lumber
Company continued to perform the contract sued on until the
16th day of July, 1908, at which time it refused to deliver
any more cars under the terms of said contract to the main
line of the Rock Island Railroad, which had become the suc-
cessor of the Arkansas Southern Railroad Company.  During
the latter part of the year 1907, and after the spur track had
been torn up, the Edgar Lumber Company hauled the cars con-
taining its lumber and the timber of the Cornie Stave Company
over the line of the El Dorado & Wesson Railroad to El Dorado.
In the early part of 1908 the latter road began operation as a
public carrier, and thereafter until the 16th day of July, 1908,
it hauled said cars and charged the freight to the Edgar Lumber
Company.  After July 16, 1908, when the Edgar Lumber Com-
pany refused to further pay the freight, it was paid under pro-
test by the Cornie Stave Company to the El Dorado & Wesson
Railroad Company, and this suit was brought against the Ed-
gar Lumber Company to recover the amount of freight so paid.

During the years 1906 and 1907, the Edgar Lumber Com-
pany operated daily over the spur track from Wesson to Cornie
Junction a motor car which carried mail and passengers, except
when it was broken down.

The court tried the case sitting as a jury, and found for the plaintiff. Judgment was therefore rendered in favor of the Cornie Stave Company against the Edgar Lumber Company for $972.11. To reverse that judgment this appeal is prosecuted.

*Gaughan & Sifford,* for appellant.

The wording of the contract should be looked to, to determine the intent of its makers. 15 L. R. A. (N. S.) 854; 71 Ark. 552. There was no binding contract on appellant. Cook on Corp., vol. 4, p. 704.

*Powell & Taylor,* for appellee.

Appellant is estopped to deny liability. 74 Ark. 190; *Id.* 377; 77 Ark. 109; *Id.* 128; 69 Ark. 287; 79 Ark. 14; 78 Ark. 483. Even if the contract was made without authority, appellant is bound by ratification. 11 Ark. 189; 21 Ark. 539; 28 Ark. 59; 29 Ark. 131; 66 Ark. 209; 112 Fed. 554; 119 Fed. 279; 121 Fed. 343; 43 N. E. 47; 6 L. R. A. (N. S.) 397.

HART, J., (after stating the facts). It is earnestly insisted by counsel for appellant that the contract in question is illegal and void as being in restraint of trade. It is well settled that agreements by common carriers which interfere with the performance of their duties to the public are illegal and void as being contrary to public policy. 9 Cyc. 498. No one has a right to enter into a contract where the obligation imposed by it can not be performed by the other party without a violation of law; but we do not think the rule has any application to the facts adduced in evidence in the case at bar. While the tram road from Wesson west into the timber was a standard gauge steam railroad, it was operated for private carriage. The undisputed evidence shows that the McDaniel Lumber Company built it for the express purpose of hauling its own logs to its sawmill. It was not chartered as a public carrier, and its owner and operator did not hold it out as such. It was operated as a private carrier, and as such its owner had the right to contract to haul exclusively for one person, firm or corporation. As a private carrier, it had a right to give a preferential rate to appellee in consideration of doing all its hauling. The evidence also shows that the spur track from Wesson to Cornie Junction was a private spur, and was not built for the use of

the public.  The railroad company did not operate its trains on the spur, and that it was built for the exclusive use of the lumber company is shown by the fact that when they ceased to use it the spur track was torn up.  It was attempted to establish the fact that the spur track was operated as a common or public carrier by showing that the lumber company ran a motor car between Wesson and Cornie Junction in 1906 and 1907 for the purpose of carrying the mail and passengers, but the evidence does not show that any charge was made for their carriage.  When it is remembered that the evidence shows that Wesson came into existence by the location of the lumber company's sawmill, it may be inferred that this motor car was run for the convenience of the company and its employees.  In any event the fact that the motor car for mail and passengers was run during the years 1906 and 1907 does not establish the fact that the spur was operated as a public carrier of freight.  Indeed, the evidence establishes just the reverse.  It shows that the spur track was laid for the exclusive private use of the lumber company, and that it was not operated as a public carrier of freight.  In construing a contract in all  essential particulars similar to the one in question; the Supreme Court of Virginia in the case of *Merriman* v. *Cover,* 104 Va. 429, held (quoting from syllabus) : "2.  A contract in restraint of trade is valid when founded on a valuable consideration, if the restraint imposed is reasonable as between the parties  and not injurious to the public by reason of its effect upon trade.  Whether or not the restraint is reasonable is to be determined by considering whether it is such only as to afford a fair protection to the interests · of the party in whose favor it is given, and not so large as to interfere with the interests of the public.  Upon the evidence in the case at bar the stipulation by defendants as private individuals and owners of a steam railroad, engaged in private carriage, that no chestnut oak bark shall be shipped over their road except to the plaintiffs, unless they refuse to pay the market price therefor at their own or any other large tannery in that county, is reasonable as between the parties, and does not injuriously affect the public, and hence is valid."

It is next contended by counsel for appellant that the words "to their nearest connection with the Arkansas Southern Railroad," as used in the contract, did not mean Cornie Junction,

but that it meant Wesson. They insist that, if Cornie Junction had been meant, it would have so stated in the contract by that name. Their contention has no argumentative force; for, as said by counsel for appellee, if Wesson had been meant, it would have been just as easy to have named Wesson in the contract. Indeed, the contention of appellee is more reasonable; for the line of the Arkansas Southern Railroad was located, and was not likely to be changed. The town of Wesson had a fixed location; and if the latter point had been meant, the parties would have used the word "Wesson," instead of the words, "their nearest connection with the Arkansas Southern Railroad." On the other hand, the lumber company prepared the contract, and may not have wished to name their point of connection as Cornie Junction for the reason that this would have compelled them to deliver at that point. They doubtless wished to use language that would enable them to change their point of connection with the Arkansas Southern Railroad during the life of the contract without committing a breach of it. This seems to have been the interpretation placed upon the contract by the parties; for the cars were delivered at Cornie Junction until the spur track was torn up, and then, by consent, the place of delivery was changed to El Dorado, and the contract as thus construed was carried out until the 16th day of July, 1908. Hence we think the parties are bound by their own construction of the contract as evidenced by their acts in performing it.

It is next contended by counsel for appellant that it did not, by the purchase of the property of the McDaniel Lumber Company, become liable to perform its contracts. This may be true, and still they are liable under the facts and circumstances in evidence. The evidence shows that the appellant purchased the entire property of the McDaniel Lumber Company in 1904, and its officers state that they found the contract in force and continued to perform it upon the same terms as provided in the original contract. They so continued to perform the contract until July 16, 1908, at which time they refused to further perform it. Their refusal was not based upon the ground that they were not liable to perform it, but was based upon a disagreement as to what was meant by its terms. This act itself was a recognition of the binding force of the contract. While the mere fact that appellant purchased the property of the Mc-

Daniel Lumber Company did not make it liable upon that company's contract, yet, having accepted the contract and having undertaken to perform it according to its terms for the period of nearly three years, it may now be said that it assumed the contract. Having reaped the benefits of the contract for that length of time with a full knowledge of its terms and conditions, it is now estopped to deny liability under it.

The judgment will therefore be affirmed.