### HARVEY *v.* MARR.

### Opinion delivered May 2, 1927.

1. MINES AND MINERALS—CONTRACT TO DRILL—CONSIDERATION.—Where a lease was in proved territory, and there was already a producing well on the lease, a contract for drilling a well whereby the driller was to be paid out of the other parties' interest in the first oil produced, and was to share in oil produced according to the amount the well produced, the contract was not void for want of consideration.

2. MINES AND MINERALS—LIABILITY CONTRACT.—The purchaser of an interest in an oil lease, who collected oil as provided for in the contract and received the benefits thereof, became liable according to its provisions.

3. MINES AND MINERALS—WAIVER OF PROVISION OF CONTRACT.—Where the requirement as to standardization was waived by consent of the parties to a contract for drilling an oil well, and a compressor was installed in lieu thereof, the cost to be shared equally by the parties, the cost of standardization should not have been charged against the purchaser of the driller's interest in the lease.

4. MINES AND MINERALS—BREACH OF CONTRACT.—The purchaser of a driller's interest in an oil lease, who failed to drill a second well as required by the contract, should be charged with the entire cost of a well drilled by the receiver appointed by the court, less the amount to which he would have been entitled under the contract had he drilled the well himself.

Appeal from Union Chancery Court, Second Division; *George M. LeCroy,* Chancellor; modified.

*Haynie, Parks & Westfall,* for appellant.

*Gaughan & Sifford* and *Streett & Streett,* for appellee.

SMITH, J.   In November, 1925, a contract in writing was entered into between J. E. Marr, as party of the first part, and Bray-Hawthorne Company, a corporation, as party of the second part, concerning a ten-acre oil lease in Union County and a standard rig complete, and the tools, appliances and equipment to drill oil wells then located on the lease.   The lease was in oil-producing territory, which was called a "high-powered production," and there was a small well on the lease producing about 100 barrels per day.   This well had only been drilled to the shallow sand.

The party of the second part agreed to drill a well to the second sand and to standardize it at its own expense for the sum of $2,000 to be paid out of the first party's interest in the first oil produced on the lease.   The contract provided that, if the well should produce more than 100 barrels of oil per day, the parties should share the production equally, and should also share the expense of operation equally, but, if the well produced only 100 barrels or less, the second party should receive three-fourths of the oil and the party of the second part the remaining one-fourth.

The contract further provided that, if the well should produce more than 100 barrels per day, the second party should drill a second well and equip it with a standard rig at its own expense, the production to be distributed as in the case of the first well.   It was further provided that, if the first well should produce 500 barrels or more per day, the party of the second part should have, in addition, the first 1,700 barrels produced; but the well does not appear to have produced that quantity of oil.

As a further consideration the party of the first part agreed to pay the party of the second part the sum

of $1,500 upon the completion of the second well, payment to be made out of the first oil produced.

At the time this contract was made Marr, the party of the first part, owned only an undivided half interest in the lease. The other half was owned by the Continental Supply Company, but Marr had control of this half interest, and it could only be acquired through him or with his consent, and he testified that, if he had not made this contract with the Bray-Hawthorne Company, he could have made a similar contract with some other party, as there was no question about the oil being under the land.

After the execution of the contract an abstract of the title was submitted, from which it appeared that Marr owned only an undivided half interest, but he advised the Bray-Hawthorne Company that the other half could be purchased for $7,500, but, when an offer to buy was made, the owner demanded $8,500, and that sum was paid by the Bray-Hawthorne Company, which elected to proceed under its contract with Marr, although he owned only a half interest, and the other half could not be purchased for $7,500, as Marr represented it could be. The Bray Company drilled the first well, as the contract required it to do, and it produced more than 100 barrels per day. Each party was therefore entitled to one-half of the production.

The Bray Company sold their interest in the lease to E. J. Harvey, as trustee, who collected the $2,000 in oil as provided in the contract between Marr and the Bray Company, but Harvey declined to drill a second well. Another company which owned adjoining land drilled a well within 700 feet of the boundary line of the lease, from which a large quantity of oil was produced, and Marr again demanded the drilling of a second well on the lease as an offset well, and, when Harvey again declined to drill the well, Marr applied for and secured the appointment of a receiver, who, under the direction of the court, drilled a second well, which also produced more than 100 barrels of oil per day. Thereafter Marr

prayed partition of the lease and that the rights of the parties therein be adjusted in accordance with the provisions of the contract between Marr and the Bray Company.

The court found that Harvey, although not a party to the contract between Marr and the Bray Company, was aware of its provisions and had accepted its benefits and thereby became estopped to deny his responsibility and obligations thereunder, and granted the relief prayed. A finding was made that partition could be effected only by a sale, and the receiver was ordered to sell for that purpose. The court found that Harvey was chargeable with the cost of standardizing the first well and was liable for the cost of drilling the second well, and, not having paid same, his interest therein should be charged with the cost of standardization, which the court found to be $4,000, and the cost of drilling the second well, which was found to be $14,000. Upon this finding the receiver was directed to pay Marr one-half the proceeds of the sale and to deduct and pay Marr $18,000 out of the remaining half. To these findings exceptions were saved, and this appeal is prosecuted to reverse the decree based on those findings.

It is not questioned that Harvey proceeded under the contract and that he collected the $2,000 which the contract allowed the Bray Company to collect upon the completion of the first well. But it is insisted that the contract is void as being without consideration, and that the court erroneously adjudged the rights and obligations of the parties thereunder.

The contract is not void for the want of a consideration to support it. The lease was in proved territory, and no doubt was entertained that oil would be produced; in fact there was already a small producing well on the lease when the contract was made. It was not known, however, what quantity of oil would be produced if the deeper sands were reached. If only 100 barrels or less were produced, the Bray Company would have been entitled under the contract to three-fourths of the pro-

duction for the life of the well, which was estimated at seven years, although it owned only a half interest in the lease, and so also with the second well which it agreed to drill. The contract may have been improvident, but there was a valuable consideration for it, and it was therefore valid, and, when Harvey adopted it and acted upon it and received the benefits thereof, he became liable according to its provisions.

Appellant claims that appellee failed to pay his part of the operating expenses of the lease after the deep sand well was brought in, as the contract required him to do, and insists that this failure was a breach of the contract which absolved him from the obligation to drill the second well. The testimony, however, does not sustain this contention.

Harvey failed to put a standard rig upon the first well drilled, this being what is meant by standardizing it, and it was for this failure that the court charged the $4,000 cost of standardization against the interest of Harvey.

It appears, however, that, by consent, the parties waived the requirement as to standardization, and, in lieu thereof, installed an air compressor, the cost of which, as we understand, was shared equally by the parties. The court should not therefore have charged appellant with the $4,000 item representing the cost of standardization, and the decree will be modified by striking out that item.

The court directed the receiver, after selling the property and paying certain costs and expenses, to pay Marr one-half of the proceeds of the sale, and further ordered the receiver, out of the remaining half, to pay Marr $18,000, of which $4,000 was the cost of standardization, the remaining $14,000 being the cost of the well which the receiver had drilled. We have said the court should not have charged the $4,000 item against Harvey, and we do not understand the theory upon which the charge of $14,000 for drilling the well was made.

It appears that, under the directions of the court, the receiver had drilled the well which Harvey was obligated to drill, but, as the receiver has not made his final report, it is not clear whether this well has been paid for by him, and, if so, how.

The order of the court in this behalf authorized the receiver, in conjunction with Marr, to enter into a contract for drilling the well and to appropriate to the payment thereof the proceeds of the sale of oil which the receiver had collected, and to pledge the future production of oil, and, if necessary, to issue receiver's certificates therefor in payment of the expense of drilling the well. The regularity of this proceeding is not before us, and we are only adjusting the rights of the parties, that action having been taken. *Harvey* v. *Marr, ante,* p. 80.

Under the contract set out above Harvey should be charged with the entire cost of the well drilled by the receiver, but he should also be allowed credit for the $1,500 to which he would have been entitled under the contract had he drilled the well himself.

The decree of the court below ordering the sale of the lease and the machinery and equipment incident thereto will be affirmed, and the receiver will make the sale pursuant to the directions of the court, if he has not already done so, but the cause will be remanded with directions to the court to make a final statement of the account between the parties, as herein directed.