THE TEXAS COMPANY *v.* MATTOCKS.

4-8182                                   204 S. W. 2d 176

Opinion delivered June 30, 1947.

Rehearing denied September 22, 1947.

*John C. Jackson, H. R. Wilson, Mahony & Yocum, Karl F. Steinmann, Edwin H. Brownley* and *Davis & Allen,* for appellant.

*Gaughan, McClellan & Gaughan, T. O. Abbott* and *Claude Crumpler,* for appellee.

Robins, J. D. E. Armstrong and wife, owners of certain lands in Union county, on April 27, 1920, executed to Harley R. Hinton and P. R. Mattocks an oil and gas lease thereon. The lease was in ordinary form and reserved to the lessors an undivided one-eighth royalty.

Hinton and Mattocks, by written instrument dated March 8, 1921, assigned an undivided one-half interest in this lease to White Oil Corporation. The consideration of this assignment was $686,250, of which $274,500 was paid in cash, $274,500 was represented by notes (all of which have been paid) executed by White Oil Corporation to Hinton and Mattocks, and the balance of $137,250 was, under the terms of the assignment, to be paid if and when seven-eighths of the total production of oil from the land amounted to 900,000 barrels. This final installment of $137,250 is the subject matter of the instant case.

White Oil Corporation assigned this lease to United Central Oil Corporation on December 27, 1923, and in the assignment it was specifically provided that the latter corporation assumed the obligations of the former as to the lease. In 1925, United Central Oil Corporation changed its corporate name to Crown Central Petroleum Corporation.

On July 26, 1926, Crown Central Petroleum Corporation assigned its interest in said lease to The Texas Company.

Crown Central Petroleum Corporation, which was a Delaware Corporation, on September 20, 1937, became, under a consolidation agreement, Crown Central Petroleum Corporation of Maryland.

For brevity White Oil Corporation will be hereinafter referred to as "White," United Central Oil Corporation as "United," Crown Central Petroleum Corporation of Delaware as "Crown Central," Crown Central Petroleum Corporation of Maryland as "Crown," and The Texas Company as "Texas."

The exact date when oil production from the leased lands began is not shown, but a letter written by an officer of "Crown Central," dated September 1, 1926, to "Texas" stated that seven-eighths of the oil produced from these lands up to July 26, 1926, the date of the assignment by "Crown Central" to "Texas," amounted to 473,335 barrels.

It is admitted by "Texas" that from the time it took over the lease it produced therefrom 426,665 barrels of oil, up to sometime (exact date not shown in testimony) in September, 1940; so that on that date the 900,-000 barrel production on the seven-eighths working interest was reached.

This suit was filed on March 27, 1941, against "Crown" and "Texas" by appellees, who had acquired the interests of Harley R. Hinton and P. R. Mattocks in the lease herein involved. In their complaint appellees set out their respective interests, alleged that seven-eighths of the total production of oil from the land covered by the assigned lease had already amounted to 900,000 barrels of oil and that therefore the balance of the consideration, namely $137,250, had become due. Prayer of appellees' complaint was for judgment against "Crown" and "Texas" for $137,250 and interest and for foreclosure of their lien against the one-half interest in said oil and gas lease.

After the filing of certain demurrers and motions not necessary to catalogue here "Crown" and "Texas" answered. Each of them denied any liability and each denied that production of 900,000 barrels of oil on the leasehold had been reached. A plea of limitation was asserted by each of them and in the answer of "Crown" there was a cross complaint against "Texas," in which

it was prayed that if any judgment for appellees should go against "Crown," "Crown" might recover all or a proportionate part thereof from "Texas."

The lower court found that the 900,000-barrel production of oil, required to mature the final installment of purchase money under the terms of the assignment of the one-half interest in the lease to "White," had been attained and rendered judgment against "Crown" and "Texas" for $137,250, with interest at the rate of six per cent per annum from October 1, 1940, until paid.

The lower court made no formal order on the cross complaint of "Crown" against "Texas." As to this phase of the case the decree recites: "The court declines to find for cross complainant over against The Texas Company for the full amount of the obligation sued on. The question as to whether the amount of the judgment and decree in favor of plaintiffs should be prorated between the two defendants on some equitable basis, is not presented to the court and no finding is made thereon."

Both "Crown" and "Texas" have appealed, and "Crown" has cross appealed against "Texas." Their contentions and arguments here are addressed to these questions:

I. Whether the evidence was sufficient, as against both appellants, to show that the 900,000-barrel production had been attained.

II. Whether, if the required production was shown, liability in favor of appellees against "Crown" was thereby established.

III. Whether, if the required production was shown, liability in favor of appellees against "Texas" was proved.

IV. Whether liability as between "Crown" and "Texas" was or should have been established by the decree.

## I.

In the same paragraph of the assignment from Hinton and Mattocks to "White" that contains provision for payment of the final installment of $137,250, the subject matter of this litigation, this language appears: "The books and other papers relating to said operation and development shall be open to the reasonable inspection and examination of parties of the first part [Hinton and Mattocks]."

At the beginning of the trial appellees moved that "Crown" be required to "produce the record of oil produced from the Armstrong lease involved in this suit during the period of time when oil was produced therefrom by the United Central Oil Corporation, Crown Central Petroleum Corporation of Delaware and Crown Central Petroleum Corporation of Maryland."

To this motion "Crown" responded that it had made a diligent search for the records of United Central Oil Corporation and Crown Central Petroleum Corporation of Delaware pertaining to operations on the lease involved and had been unable to find same. It further averred that Crown Central Petroleum Corporation of Maryland had never had anything to do with operations on this lease, and that while "Crown Central" had transferred the lease to "Texas" in 1926, its consolidation with "Crown" of Maryland did not occur until in 1937. Several employees of "Crown" testified in support of the allegations in this response, and appellees, being unable to show that "Crown" had any of these records, the motion was overruled.

To sustain their contention that the final installment due them had been matured appellees introduced as a witness A. R. Carmody, president of appellee, North Central Texas Oil Company, which had purchased 32/64ths of the interest owned by Hinton and Mattocks. Mr. Carmody testified that during the time operations on the lease were being carried on by "White," "United," and "Crown Central," monthly statements, showing how much oil had been run were furnished to

him, and that similar statements were furnished after "Texas" took over the lease. He stated that on November 18, 1940, he wrote "Texas" a letter (copy of which he introduced) as follows: "D. E. Armstrong Lease . . . Your production figures indicate that the above lease has produced to the working interest (⅞ths) 901,-680 barrels through October 31st, 1940. Under the terms of the above lease was included a payment to this Company of $68,625 payable as, if and when the working interest (⅞ths) production equalled 900,000 barrels. We shall appreciate having your check for the above payment."

The letter he received, in reply to his, from "Texas," which was introduced in evidence by Mr. Carmody, was as follows: "We acknowledge receipt of your letter of November 18th. The production from the Armstrong lease is now in excess of 900,000 barrels for the ⅞ths working interest. Our company does not feel it is personally liable or responsible for the indebtedness and we suggest that you look to the Crown Central Petroleum Corporation, whose address is Pasadena, Texas (suburb of Houston, Texas) for the payment to which you refer."

There was also introduced in evidence a letter written by the vice-president of "Crown Central" on September 1, 1926, to "Texas," in answer to an inquiry by "Texas" as to production from the Armstrong lease, which was as follows: "This will acknowledge your letter of August 27th *re* the above subject and in reply to same wish to state that as of 7 a. m., July 26, 1926, [date of assignment from "Crown" to "Texas"] ⅞ of the total production from this lease had amounted to 473,335 barrels."

J. C. Brooks, called as a witness by appellees, testified that he had been employed by "Texas" for 25 years and had been connected with the production accounting department since 1930, and that he was familiar with the records of production of the Armstrong lease. Mr. Brooks explained in detail the manner in which these records were made up from "run tickets" signed by representa-

tives of the pipe line company. He testified that these records showed a production by "Texas" from the working interest on the Armstrong lease of 474,954 barrels up to December 31, 1945, that they had obtained information as to the production prior to July 26, 1926, when "Texas" took over the lease, and that such production, according to this information, was 473,335 barrels; and that, if this information was correct, "the Armstrong lease had produced 900,000 barrels for the working interest only, the date was September, 1940." This witness introduced in evidence a memorandum attached to his record, which was as follows: "Statement of Gross (⅞ WI) Production on Armstrong Lease—When Production aggregates 900,000 Barrels Payment of $137,250 is to be made to P. R. Mattocks and N. C. T. Oil Co." This memorandum was followed by a detailed record of the production by dates of "run tickets."

In the face of this evidence, it is argued by "Crown" and "Texas" that the production of 900,000 barrels of oil from the working interest involved was not shown by competent testimony.

"Crown" contends that the letter written by "Texas" admitting attainment of the required production was not binding on or admissible against "Crown." "Texas" urges that its letter was necessarily based on information, as to oil production from the lease prior to "Texas" taking it over, contained in the letter written to "Texas" by "Crown," and that this letter being "hearsay" as to "Texas," the admissions based thereon contained in the letter written by "Texas" is not binding even on "Texas." It is also argued that the testimony as to what the books of "Texas" showed as to the oil production was not competent because the different persons who made the entries were not called as witnesses.

We do not deem it necessary to pass on these technical objections, because under the facts shown here the burden of proof was on appellants to show what the oil production from the lease was. The assignment under which both of them acquired their rights clearly showed

that all parties contemplated that books reflecting the "oil run" should be kept by the producer and that these books should be open to inspection by the appellees and their predecessors in title. No one but the producer could possibly know the amount of oil production. The principle applicable here was thus stated by Mr. Wharton (Evidence, § 367): "When a fact is peculiarly within the knowledge of a party, the burden is on him to prove such fact, whether the proposition be affirmative or negative.' *Hopper* v. *State,* 19 Ark. 143; *William* v. *The State,* 35 Ark. 430; *Fowler* v. *The State of Arkansas,* 39 Ark. 209; *City of Fort Smith* v. *Dodson,* 51 Ark. 447, 11 S. W. 687, 4 L. R. A. 252, 14 Am. St. Rep. 62.

Since the appellants had the *onus* at the trial to show what the true amount of the oil production was, they were not in a position, in a court of equity, to challenge facts reflected by their own admissions in writing and by the books of either of them. There was abundant proof to justify the findings of the lower court that the 900,000 barrels of oil had been produced from the 7/8ths interest in the lease involved.

## II.

On behalf of "Crown" it is argued that since there was nothing in the assignment of the lease or in the lease itself which obligated "White" or its assignees to drill on the land embraced in the assigned lease, there was no obligation upon "Crown" to pay the delayed consideration sued for herein. But certainly under the original assignment there would have been an obligation on "White" to pay this installment if "White" had been operating the lease when the required amount of production was reached. Neither "White" nor any subsequent assignee could avoid this liability by simply transferring the lease to some one else. If this liability could be so evaded, a solvent producer working a lease under an agreement of the kind involved here, after producing 890,000 barrels might assign the lease to an insolvent person or corporation and, after the production of 900,000 barrels of oil was reached, defeat entirely the collection of the final installment.

"White," by accepting the assignment, obligated itself to pay the final installment of the consideration of the assignment. "United" specifically assumed the obligations of "White." By operation of law the liabilities of "United" were finally cast upon "Crown." It follows that "Crown," as far as the appellees are concerned, is liable for the $137,250 installment sued for herein.

### III.

"Texas" argues that it was not a party to the original assignment and that it has never assumed or agreed to pay the indebtedness sued on here. The assignment to "White" was recorded. "Texas" therefore took the interest of "Crown" with notice that this obligation would become due when the required amount of production was reached.

A somewhat similar question was involved in the case of *Graysonia-Nashville Lumber Co.* v. *Saline Development Co.*, 118 Ark. 192, 176 S. W. 129. In that case it appeared that Saline Development Company had sold and conveyed to Nashville Lumber Company the merchantable timber on a large tract in Howard county. The consideration recited in the contract, which was referred to in the deed, was the payment of $5,298 which represented a calculation of $2 per thousand on an estimated 2,625,000 feet of timber, and it was provided in the contract that the purchaser should pay the further sum of $2 per thousand for all timber, in excess of said estimate, as same was cut. The Nashville Lumber Company sold the timber to Graysonia-Nashville Lumber Company, and, upon its refusal to pay the company for the amount of timber cut in excess of 2,623,000 feet, Saline Development Company sued and recovered judgment therefor in the chancery court. On appeal to this court, the decree of the lower court was affirmed, it being held that the Graysonia-Nashville Lumber Company was bound by the provisions in the contract between its vendor and Saline Development Company and had assumed the contingent balance of the purchase money.

Likewise, dealing with the liability of an assignee of an oil lease, we said, in the case of *Thurman* v. *Moore,* 178 Ark. 885, 13 S. W. 2d 22: 'The assignee simply stepped into the shoes of the lessee. He took his assignment subject to the payment of the purchase price out of the oil produced.'

We held in *Harvey* v. *Marr,* 173 Ark. 880, 293 S. W. 1005, (headnote 2): "The purchaser of an interest in an oil lease, who collected oil as provided for in the contract and received the benefits thereof, became liable according to its provisions."

In support of the contention that "Texas" is liable to appellees herein it is argued that the agreement to pay the final installment of purchase money, set forth in the assignment from appellees' predecessors in title to "White," is in the nature of a covenant running with the lease. Whether this contention is well founded we do not find it necessary to decide. "Texas" took over this assignment and, according to its own admission, produced nearly half a million barrels of oil therefrom, and thereby caused the final installment of purchase money to mature. Since "Texas" accepted the benefits accruing under the assignment, it must bear the burdens thereof. *Atlantic & North Carolina Railroad Company* v. *Atlantic & North Carolina Co.,* 147 N. C. 368, 23 L. R. A., N. S. 223, 125 Am. St. Rep. 550, 15 Ann. Cas. 363, 61 S. E. 185; *Union Pacific Railway Company* v. *Douglas County Bank,* 42 Neb. 469, 60 N. W. 886; *Kirby Lumber Company* v. *R. L. Lumber Company* (Tex. Civ. Ap.), 279 S. W. 546; *South* v. *Williamson Dealers Corporation,* 298 Ky. 557, 183 S. W. 2d 634; *C. V. Hill & Company* v. *Hadden's Grocery,* 299 Ky. 419, 185 S. W. 2d 681.

Furthermore, in the construction of the assignments herein involved, we have a right to resort to the construction the parties themselves have placed upon these agreements. It is a familiar rule that, when construing a contract, meaning of which is in doubt, a court may consider how the parties themselves have—by their words and acts—construed it. Chief Justice HILL, in the case of

*Kahn,* v. *Metz,* 88 Ark. 363, 114 S. W. 911, quoted with approval this language of Lord Chancellor Sugden: " 'Tell me what you have done under a deed, and I will tell you what that deed means'." Other cases in which "practical construction" of a contract, as shown by the acts of the parties thereunder is upheld, are: *Edgar Lumber Company* v. *Cornie Stave Company,* 95 Ark. 449, 130 S. W. 452; *Keopple* v. *National Wagonstock Company,* 104 Ark. 466, 149 S. W. 75; *Continental Insurance Company* v. *Harris,* 190 Ark. 1110, 82 S. W. 2d 841.

The undisputed evidence shows that as soon as "Texas" acquired its interest in this lease it wrote to "Crown Central" and ascertained the amount of production up to the time "Crown Central" assigned to "Texas." It was also shown that one of the production officials of "Texas" kept on his desk a memorandum calling attention to the fact that when 900,000 barrels were produced from the ⅞ths working interest under this lease the $137,250 payment would be due. If "Texas" had taken this assignment from "Crown Central" with the understanding or belief that no liability for this final installment would rest on "Texas," why would the amount of production up to the time "Crown Central" assigned have been of such importance to "Texas" as to require it to ascertain such production? And, if "Texas" had no obligation as to this installment, there could have been no valid reason for the memorandum as to the liability being kept on the production manager's desk. All these circumstances, about which there is no dispute whatever in the testimony, point strongly to the conclusion that "Texas" considered itself liable under the provisions of the assignment through which it claimed title.

"Texas" took over this lease with notice of the contingent liability for the final installment. It operated the lease, received the benefits conferred by the assignment to "White" and its production actually matured the final installment by producing the nine hundred thousandth barrel of oil from the working interest. It may not avoid liability for this payment.

## IV.

"Texas" asked no relief as against "Crown." "Crown," in its cross complaint, prayed judgment against "Texas" for any amount that "Crown" might be compelled to pay appellees.

The lower court apparently determined that the question of the liability of appellants *inter sese* was not properly before it. While in the findings the court stated that it would not grant "Crown" "in full" the relief it prayed against "Texas," there was in the ordering part of the decree no disposition of "Crown's" cross complaint against "Texas." The lower court might have considered that, "Crown" not yet having paid appellees anything, its cross complaint was premature. We treat the decree below as not having in any manner disposed of the rights and liabilities of "Crown" and "Texas" as between themselves, and, so that this entire branch of the controversy may be left open for future settlement or adjudication, we modify the decree of the lower court so as to show that the cross complaint of "Crown" against "Texas" is dismissed without prejujdice. With this modification, the decree appealed from is affirmed.

The Chief Justice, Mr. Justice McFADDIN and Mr. Justice MILLWEE dissent as to that part of the opinion which authorizes judgment against The Texas Company for any amount in excess of $65,066.42 and interest.